**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**MARY L. RIVERS, Administrator**
**of the Estate of Cameron Straughter,**

        **Plaintiff,**                    **Case No. 2:06-cv-712**
                                            **JUDGE GREGORY L. FROST**
      **v.**                              **Magistrate Judge Terence P. Kemp**

**KENNETH BOWERS, et al.,**

        **Defendants.**

**OPINION AND ORDER**

This matter is before the Court for consideration of a motion for summary judgment

(Doc. # 15) filed by Defendants City of Columbus and Officer Kenneth Bowers, a memorandum

in opposition (Doc. # 34) filed by Plaintiff, and a reply memorandum (Doc. # 39) filed by

Defendants. For the reasons that follow, this Court finds the motion well taken only in part.

**I. Background**

On August 21, 2004, the Columbus Division of Police received a 911 call from the

manager of a Red Roof Inn located in Hilliard, Ohio. The manager, Tami Miller, stated that she

thought she was about to be robbed by a man who had just been in the motel lobby. She

provided a description of the man and stated that he had a gun in the back of his pants. Officers

were therefore dispatched to the scene on a code 33, or a "gun run," which means that a man had

been reported carrying a gun.

Officer John Frenz responded to the call. He obtained a description of the man identified

in the call from Miller at the Red Roof Inn, which he broadcast over the air. Other officers also

responded to the call, including Officers Kenneth Bowers and Eric Everett, who were in the

1

same police cruiser, Officer Timothy Elkins, and Officer Dennis Prestel.  Prestel was the first to observe the suspect, Cameron Straughter, as Straughter walked east along Renner Road and then south on St. James Lutheran Lane.  Prestel followed Straughter in his cruiser.

Bowers and Everett spotted Prestel and Straughter as the latter man proceeded southbound on St. James Lutheran Lane.  The two officers drove past Prestel's cruiser and Straughter so that Straughter was between the two cruisers.  At this point Prestel stopped his cruiser and started to get out.  Straughter then reversed course, running northbound on St. James Lutheran Lane.  He ran east into a wooded area and jumped a fence.  Prestel followed on foot, yelling for Straughter to stop.  Still in their cruiser, Bowers and Everett traveled to the other side of the wooded area.

Prestel observed Straughter pull an object from the back of his pants.  The officer radioed that "he pulled it out" and advised his fellow officers to "be careful."  (Doc. # 15-11, Prestel Aff. ¶ 6.)  Both Bowers and Everett recall hearing this warning.

Elkins also spotted Straughter carrying an object in his hand and moving northbound on St. James Lutheran Lane.  The officer drew his gun and yelled for Straughter to stop before he drove ahead of Straughter to the intersection of Renner and Rentra Roads.  Once there, Elkins got out of his cruiser with his gun drawn.  At the same time, Bowers and Everrett, who were around the block, had also exited their cruiser and were approaching on foot.  When Straughter exited a tree line, Elkins pointed his gun at the man and told him to "drop it" and to "get on the ground."  (Doc. # 15-10, Elkins Aff. ¶ 6.)

Bowers and Everett heard Elkins yelling, but could not yet see Straughter from their position.  When these officers moved around the tree line, they saw Straughter.  Bowers asserts

2

that he saw a shiny metallic object in Straughter's right hand, which the officer thought was a gun.  Everett also asserts that he observed the object and that he thought it was a gun.  Meanwhile, Frenz arrived and, spotting Straughter running, stopped his cruiser on Renner Road.  He approached Straughter on foot.

Bowers asserts that he yelled at Straughter several times to "drop it" and "get on the ground or I'll shoot."  (Doc. # 15-8, Bowers Aff. ¶ 15.)  Straughter allegedly looked directly at Bowers but failed to comply with the commands.  Bowers then saw Frenz running toward him from behind Straughter.  Bowers asserts that Straughter suddenly turned toward Frenz.  At this point Bowers fired a single shot.  The shot hit Straughter in the back, killing him.  When the officers approached Straughter's body, they recovered a pruning tool on the ground next to him.

Three civilians witnessed the shooting.  Nathan Nazeck asserts that he was stopped at a red light at the intersection of Renner and Rentra Roads when he saw an officer get out of a police cruiser and draw his gun.  In an affidavit, Nazeck states that he watched a group of officers as Straughter exited the woods with a "grey or black, and silver object in his right hand" that he believed to be a weapon.  Nazeck asserts that he then saw Straughter suddenly turn and run, heard a gunshot, and watched Straughter fall to the ground.  (Doc. # 15-13, Nazeck Aff.)

Brandon Pritchard also witnessed a portion of these events.  Pritchard asserts that he was driving on Renner Road when he noticed a police cruiser following Straughter.  After pulling into a Burger King restaurant, Pritchard reportedly saw another cruiser begin to follow Straughter, saw Straughter run, and saw the pursuit through the wooded area.  Via affidavit, Pritchard asserts that he watched the "standoff," saw Straughter holding an object in his right hand, and saw the man turn and dart toward other officers, followed by a gunshot and

3

Straughter's fall to the ground.  Pritchard states that he does not know which officer fired the shot.  (Doc. # 15-14, Pritchard Aff.)

Within an hour after the shooting, a third civilian, Patrick Smith, called the Columbus Division of Police.  Smith indicated that he had been sitting in a van at a traffic light when the Straughter shooting occurred and that he called because he did not feel right about what he had witnessed.  According to Smith, he watched Straughter emerge from the wooded area with his hands raised above his head and surrounded by police officers.  Smith asserts that Straughter slowly took several steps toward the corner of Renner and Rentra Roads, without turning direction, and that the man was not holding anything in either hand.  Smith then saw a flash of light, heard two "pops," and watched Straughter fall to the ground.  When questioned at his deposition about the flash of light and his allegation that Straughter did not turn, Smith conceded that–given that he now knew that Straughter had been shot in the back–he was perhaps incorrect about what the flash was.  In other words, if it was not a muzzle flash but simply the lights on a cruiser, then Smith conceded that he was perhaps incorrect about the direction from which the shot came.  (Doc. # 31, Smith Dep.)

Plaintiff, Mary L. Rivers, the administrator of Straughter's estate, filed this action against Defendants Bowers and the City of Columbus on August 21, 2006.  (Doc. # 2.)  The four-count complaint asserts wrongful death and survivorship claims under state law as well as claims under 42 U.S.C. § 1983.  (Doc. # 2 ¶¶ 51-54.)  Defendants have filed a motion for summary judgment on all claims (Doc. # 15), which the parties have fully briefed and which is now ripe for disposition.

## II.  Standard Involved

4

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, who must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id.* (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52).

### III.  Discussion

#### A.  Section 1983 – Individual Liability

As noted, Defendants move for summary judgment on Plaintiff's 42 U.S.C. § 1983 claims. Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of

5

> the United States or other person within the jurisdiction thereof to the deprivation
> of any rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity, or other
> proper proceeding for redress . . . .

42 U.S.C. § 1983.  Thus, in order to assert a valid § 1983 claim, Plaintiff must show that, while

acting under color of state law, Defendants deprived Straughter of a right secured by the Federal

Constitution or laws of the United States.  *See Alkire v. Irving,* 330 F.3d 802, 813 (6th Cir.

2003).

More specifically, Plaintiff asserts a § 1983 violation for excessive force.  She asserts this

cause of action against Bowers in both his official and individual capacity.  Bowers moves for

summary judgment on the grounds that the amount of force involved here was reasonable,

thereby precluding any deprivation of a constitutional right, and on the grounds that he in his

individual capacity is entitled to qualified immunity.

There is obviously no dispute that Bowers exercised deadly force in shooting Straughter.

The only actual disputes in regard to the federal claims, then, are whether this force was

excessive so as to constitute a constitutional violation, whether a factual dispute precludes the

application of qualified immunity here, and whether the City of Columbus is potentially liable

under *Monell*.  This Court shall address each issue in turn before discussing the state law claims

before this Court via supplemental jurisdiction.

Bowers' argument first leads this Court to qualified immunity.  The qualified immunity

doctrine, under certain circumstances, operates to shield from civil liability governmental

officials, such as police officers, who are performing official duties.  *Sinick v. County of Summit*,

76 F. App'x 675, 678-79 (6th Cir. 2003).  This affirmative defense is meant to safeguard an

official's proper decision making process and offers that party potential relief from frivolous

6

suits.  *See D'Agastino v. City of Warren*, 75 F. App'x 990, 993 (6th Cir. 2003).  The Sixth

Circuit has explained that qualified immunity "shields government officials 'from liability for

civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known.' " *Id*. (quoting *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818 (1982)).  In addition to shielding officials from liability, qualified

immunity may entitle the official to not stand trial or face the other burdens of litigation.  *Saucier*

*v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  This

principal directs courts to make a ruling on the issue of qualified immunity early in the

proceedings, so that the costs and expenses of trial are avoided where the defense is dispositive.

*Id.*

    The Supreme Court has instructed lower courts to use a distinct analysis to determine

whether the application of qualified immunity is warranted.  In addressing the potential

applicability of qualified immunity, a court follows a sequential inquiry: "First, the court

considers whether, on the plaintiff's facts, there has there been a violation.  Second, the court

considers whether that violation involved 'clearly established constitutional rights of which a

reasonable person would have known.' "  *Hoover v. Radabaugh*, 307 F.3d 460, 465 (6th Cir.

2002) (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996)).  *See also Saucier*,

533 U.S. at 201; *Davenport v. Causey*, 521 F.3d 544, 550 (6th Cir. 2008).  This analytic

approach has also been characterized as a three-part inquiry in which a court must ask:

> 1) has a constitutional violation occurred; 2) was that right a clearly established
> right of which a reasonable person would have known; and 3) has the plaintiff
> alleged sufficient evidence "to indicate that what the official allegedly did was
> objectively unreasonable in light of the clearly established constitutional rights"?

*Id*. at 679 (quoting *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc)).  *See also*

*Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991) ("A public official is entitled to qualified immunity for conduct in performing discretionary functions so long as that conduct does not violate clearly established statutory or constitutional rights of which a reasonable officer would have known").

The doctrine of qualified immunity thus recognizes that an officer can be found to have violated the constitution, but be granted immunity for *reasonable* mistakes as to the legality of his or her action. *Saucier*, 533 U.S. at 206. The reasonableness of such mistakes is inherently dependant upon the clarity of the legal constraints governing particular police conduct. The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Id*. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

In determining whether a defendant is entitled to qualified immunity, "[t]he ultimate burden of proof is on [the plaintiff] to show that [the defendants] are not entitled to qualified immunity." *Wegener*, 933 F.2d at 392. *See also Russo v. City of Cincinnati*, 953 F.2d 1036, 1043 (6th Cir. 1992). Further, "[w]hen ruling on qualified immunity, the district court should indicate the clearly established right at issue and the factual basis for its conclusion that a genuine issue exists as to the commission of acts violating that right." *Wegener*, 933 F.2d at 392 (citing *Poe v. Haydon*, 853 F.2d 418, 423-24, 426 (6th Cir. 1988)).

The Court will therefore begin its analysis by examining whether a constitutional violation has occurred. Prior to the events as alleged in Plaintiff's complaint, the United States Supreme Court established that the use of force is unconstitutional if it is excessive under objective standards of reasonableness. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). It was

8

settled that at the time of the underlying events here that the use of force must be reasonable; if

no force was required, then no force was necessary.  *See id*. at 394; *Monday v. Oullette*, 118 F.3d

1099, 1104 (6th Cir. 1997) (citing *Adams v. Metiva*, 31 F.3d 375, 384-85 (6th Cir. 1994)).

As Defendants note, a great deal of discretion is afforded police officers when evaluating

reasonableness in such situations so that "[i]f the officer's mistake as to what the law requires is

reasonable . . .[he] is entitled to the immunity defense." *Magrum v. Meinke*,  332 F. Supp. 2d

1071, 1078 (N.D. Ohio 2004).  *See also Greene v. Barber*, 310 F.3d 889, 894 (6th Cir. 2002) ("A

police officer may be entitled to qualified immunity, obviously, even though he has in fact

violated the plaintiff's rights; 'reasonable mistakes can be made as to the legal constraints on

particular police conduct.'" (citations omitted)).

Accordingly, to determine whether qualified immunity applies, this Court must determine

whether Bowers' conduct was reasonable. Courts have indicated the difficulty of this

determination, stating that

> ascertaining the reasonableness of force used is not capable of precise definition
> or mechanical application, [and] the analysis focuses on the specific facts of each
> case, "including the severity of the crime at issue, whether the suspect poses an
> immediate threat to the safety of the officers or others, and whether the suspect is
> actively resisting arrest or attempting to evade arrest by flight."

*Magrum*, 332 F. Supp. 2d at 1078 (quoting *Graham*, 490 U.S. at 396). The *Magrum* court goes

on to state that "[t]he 'reasonableness' of a particular use of force must be judged from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

*Magrum*, 332 F. Supp. 2d at 1078.

Thus, a determination of whether the deadly force used was unreasonable "requires

careful attention to the facts and circumstances of each particular case, including the severity of

the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Ewolski v. City of Brunswick*, 287 F.3d 492, 507-08 (6th Cir. 2002) (citing *Graham*, 490 U.S. at 396). *See also D'Agastino*, 75 F. App'x at 994. The "objective reasonableness standard" applied in this inquiry asks whether a reasonable officer would conclude that the level of force used was appropriate. *Graham*, 490 U.S. at 396-97. This standard balances the cost to the individual against the government's interest in effectuating a seizure; it contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case. *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002) (citing *Graham*, 490 U.S. at 396 ).

The Sixth Circuit has again recently explained the consequent nature of the inquiry involved in addressing an excessive force claim predicated upon the use of deadly force:

> "[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner,* 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). This "reasonableness requirement" means that "the force used to effect a particular seizure," here the shooting, must be found reasonable after "careful[ly] balancing [ ] ' "the nature and quality of the intrusion on the individual's Fourth Amendment interest" ' against the countervailing governmental interests at stake." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (quoting *Garner,* 471 U.S. at 8, 105 S.Ct. 1694 (quoting *United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983))).
>
> "The intrusiveness of a seizure by means of deadly force is unmatched. The suspect's fundamental interest in his own life need not be elaborated upon." *Id.* at 9, 105 S.Ct. 1694. Given the extreme intrusion caused by use of deadly force, the countervailing governmental interests must be weighty indeed; "only in rare instances may an officer seize a suspect by use of deadly force." *Whitlow v. City of Louisville,* 39 Fed. Appx. 297, 302-03 (6th Cir.2002) (unpublished).
>
> The government's interest in using deadly force to effect a seizure varies based upon the circumstances faced by the officers; "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of

10

physical coercion or threat thereof to effect it," and so the question is whether the amount of force used by the officer was excessive. *See Graham,* 490 U.S. at 396, 109 S.Ct. 1865. *Garner* stated that deadly force can be used when "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others . . . ." 471 U.S. at 11-12, 105 S.Ct. 1694. "Probable cause," while "incapable of precise definition," *Maryland v. Pringle,* 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003) (unanimous), means that the facts and circumstances of which the officer is aware and are reasonably viewed as accurate are "sufficient unto themselves to warrant a man of reasonable caution to believe that" deadly force is necessary, *see Berger v. New York,* 388 U.S. 41, 55, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967).

There are certain facts and circumstances that have been held to be important when evaluating whether an officer has probable cause to believe deadly force necessary. The most common considerations are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865. While these are the most common considerations, they are not "a magical on/off switch that [constitute] rigid preconditions" to determine whether an officer's conduct constituted excessive force. *Scott v. Harris,* ---U.S. ----, 127 S.Ct. 1769, 1777, 167 L.Ed.2d 686 (2007). Another consideration is "the number of lives at risk" from the suspect's conduct, as well as the "relative culpability" of those at risk. *Id.* at 1778. We have also found that " 'the demeanor of the suspect,' " *Solomon v. Auburn Hills Police Dep't,* 389 F.3d 167, 174 (6th Cir.2004) (quoting *Minchella v. Bauman,* 72 Fed. Appx. 405, 408 (6th Cir.2003) (unpublished)), and "the size and stature of the parties involved" should be taken into account, *id.* More force is also proper, which could include deadly force, if the suspect was fighting with the police, *Untalan v. City of Lorain,* 430 F.3d 312, 317 (6th Cir.2005), or was intoxicated and noncompliant, *Monday v. Oullette,* 118 F.3d 1099, 1104-05 (6th Cir.1997). Every new case can also present new circumstances that are relevant in determining whether that particular situation required deadly force; there is no "easy-to-apply legal test in the Fourth Amendment context," *Scott,* 127 S.Ct. at 1778, and instead judges are to look to the "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act," *Pringle,* 540 U.S. at 370, 124 S.Ct. 795.

*Davenport*, 521 F.3d at 550-52.

In light of the foregoing and cognizant of the applicable summary judgment standard that must control today's analysis, this Court is not able to agree with Defendants that no constitutional violation occurred and that Bowers is entitled to qualified immunity. This is

11

because, as the earlier summary recitation of evidence indicates, there is a factual dispute as to whether Bowers shot a man holding what appeared to be a weapon or a man who was not holding anything and had his hands above his head, surrendering.  This is thus a case unlike *Davenport*, for example, in which there was no issue as to the obvious and unquestionable threat presented by the decedent.  *See id.* at 553 ("The officers were facing a large, violent, and angry individual who was unwilling to be brought under control by the officers.  Mr. Davenport had already knocked Officer Causey to the ground and was delivering blows in rapid succession to Officer Pugh's head.").

Recognizing the contrary factual contentions contained in Patrick Smith's testimony, Defendants argue that this Court must regard such testimony as incapable of creating a genuine issue of material fact because it is wholly unplausible in light of indisputable forensic evidence in this case.  To support this contention, Defendants direct this Court to the Straughter autopsy report of the Franklin County Coroner's Office.  (Doc. # 39-2.)

This report, attached simply as an exhibit to Defendants' reply memorandum without any accompanying affidavit or declaration, indicates that Straughter died of a single gunshot wound to his right back.  (Doc. # 39-2, at 1.)  Any concerns over reliance on this document due to a lack of authentication are of no import because Plaintiff makes the following concessions: "On August 21, 2004, Columbus Police Officer Kenneth Bowers shot Cameron Straughter in the back.  Cameron Straughter died as a result of the gunshot wound.  These facts are not in dispute."  (Doc. # 34, at 2.)

From the autopsy report and Plaintiff's factual concessions, Defendants extrapolate that the "forensic evidence and common sense contradict Mr. Smith's testimony that the decedent

was facing the officer who shot and that the decedent never turned before the use of force" and

that "[i]t is physically impossible for Officer Bowers to have shot the decedent in the back if

they were facing one another as alleged by Mr. Smith."  (Doc. # 39, at 4.)  Thus, Defendants

conclude, this Court must disregard Smith's testimony pursuant to *Scott v. Harris*, 127 S.Ct.

1769 (2007).

This argument relies upon a reasonable premise, as the United States Supreme Court

explained in *Harris* that "[w]hen opposing parties tell two different stories, one of which is

blatantly contradicted by the record, so that no reasonable jury could believe it, a court should

not adopt that version of the facts for purposes of ruling on a motion for summary judgment."

*Id.* at 1776.  But Defendants overreach in arguing that *Harris* is dispositive of the instant case.

Here, unlike in *Harris* where the Supreme Court regarded videotape evidence as removing any

doubt about what transpired, relevant portions of Smith's version of the events are not "so utterly

discredited by the record that no reasonable jury could have believed him."  *Id.*

Smith testified at his deposition that Straughter emerged from bushes with his hands

raised, that he was not holding anything, and that he looked scared.  Smith also testified that

Straughter was facing the direction of the flashes of light that Smith observed, flashes that Smith

perceived then to be muzzle flashes, but which he now questions in light of the fact that

Straughter was shot in the back.  Smith also testified that he did not observe Straughter turning

when the man was shot.  Even ignoring or discrediting all of the disputed factual contentions that

the forensic evidence would arguably negate, the Court is left with Smith testifying that

Straughter had emerged slowly, with his *empty* hands raised, looking afraid.  Then Straughter

was shot.  Even accepting the forensic evidence and concessions as invalidating Smith's

13

contention that Straughter did not suddenly moved toward Frenz, the Court is still left with a dispute that a factfinder could resolve in Plaintiff's favor: whether when Straughter turned he was obviously unarmed and therefore less dangerous.

The Sixth Circuit has cautioned that "[s]ummary judgement on a claim of excessive force is inappropriate where the parties dispute virtually all of the essential facts surrounding the excessive force claim because it impossible to determine whether the force used was reasonable without choosing between the parties sharply different factual accounts." *Jackson v. Hoylman*, 933 F.2d 401, 403 (6th Cir. 1991). This case presents a factual scenario in which the parties agree on many of the essential facts, but not on what is arguably the most critical fact.

A genuine issue of material fact therefore exists as to the commission of the act allegedly violating the constitutional right involved. The facts as recounted by Smith that the forensic evidence (as also supported by Plaintiff's concessions) does not contradict or arguably negate this conflict with that aspect of Defendants' evidence of the incident. A jury might elect to credit Smith's account as it relates to Straughter's alleged empty-handed surrender, which could mean that Bowers did not react reasonably when he shot the weaponless man. From this a jury might conclude that Bowers' improper action was of a constitutional dimension. In other words, if the facts of the purported empty-handed surrender are true, then a reasonable officer on the scene might not have employed deadly force. This Court simply cannot say that there has been no constitutional violation when critical material facts are in dispute. These disputed facts, which when necessarily viewed in a light most favorable to Plaintiff suggest a possible unreasonable mistake, in turn preclude application of qualified immunity at this juncture.

The Court emphasizes that it is not making any judgment whatsoever as to the ultimate

14

facts or the competence or lack thereof of Bowers.  The Court is simply concluding today that based on this evidence, which the Court is required to credit in this summary judgment context, it is not possible to conclude that the evidence is free from dispute so that summary judgment can be entered for Defendants.  This is not to say, however, that the weight of the evidence and potential credibility issues do not wholly support Defendants.  The Court simply cannot engage in such weighing or ascertain credibility as Defendants urge under the summary judgment standard.

Plaintiff has presented an excessive force claim that can survive summary judgment.  The Sixth Circuit has held that the application of force after officers knew or under the circumstances should have known that they were without justification for their actions is impermissible.  *See Pray v. City of Sandusky*, 49 F.3d 1154, 1160-61 (6th Cir. 1995).  Accordingly, there is no qualified immunity available here and no right to summary judgment.

### B.  Section 1983 – Municipal Liability

Defendant the City of Columbus (subsuming Bowers in his official capacity) also moves for summary judgment on Plaintiff's § 1983 claims.  In response, Plaintiff's memorandum in opposition does not address the merits of these claims, but instead states that "Plaintiff now voluntarily dismisses all of her claims against Defendant City of Columbus without prejudice." (Doc. # 34, at 1.)  The city in its reply memorandum asserts that any dismissal should be with prejudice.

Plaintiff's attempt at dismissal is of no effect.  Plaintiff cannot dismiss the City of Columbus without a court order.  Although the city characterizes the attempted dismissal as pursuant to Federal Rule of Civil Procedure 41(a)(1), no portion of Rule 41 can provide Plaintiff

15

the appropriate vehicle for dismissal here.  The Sixth Circuit has suggested, without conclusively

deciding the issue, that the dismissal of all claims against less than all defendants should be

pursuant to Federal Rule of Civil Procedure 21 as opposed to Rule 41.  *See Letherer v. Alger*

*Group, L.L.C.*, 328 F.3d 262, 265-66 (6th Cir. 2003), *recognized as overruled on other grounds*

*in Blackburn v. Oaktree Capital Mgmt.*, LLC, 511 F.3d 633, 636 (6th Cir. 2008).  *See also*

*AmSouth Bank v. Dale*, 386 F.3d 763, 778 (6th Cir. 2004). Plaintiff has not filed a motion under

Rule 21 and has not sought to amend her pleading to eliminate any claim against the City of

Columbus.  Accordingly, the city remains a party to this litigation and Plaintiff's *Monell* claim

remains subject to summary judgment.

   It is well settled that *respondeat superior* cannot provide a basis for liability here.

*Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 691 (1978).  Thus, to satisfy her

burden on her failure to train/failure to supervise theory, Plaintiff must demonstrate the existence

of and impropriety of an involved policy.  This is because the Sixth Circuit has explained:

> Municipalities are not ... liable for every misdeed of their employees and agents.
> "Instead, it is when execution of a government's policy or custom, whether made
> by its lawmakers or by those whose edicts or acts may fairly be said to represent
> official policy, inflicts the injury that the government as an entity is responsible
> under §§ 1983."  [*Monell v. New York City Dept. of Social Services,* 436 U.S.
> 658, 694 (1978).]  This circuit has stated that to satisfy the *Monell* requirements a
> plaintiff must "identify the policy, connect the policy to the city itself and show
> that the particular injury was incurred because of the execution of that policy."
> *Coogan v. City of Wixom,* 820 F.2d 170, 176 (6th Cir.1987) (adopting the test
> articulated in *Bennett v. City of Slidell,* 728 F.2d 762, 767 (5th Cir.1984) (en
> banc), *cert. denied,* 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985)).

*Garner v. Memphis Police Dept.*, 8 F.3d 358, 363-64 (6th Cir. 1993).  What constitutes a *Monell*

policy or custom is therefore most often of critical import to § 1983 actions such as the case *sub*

*judice*.  The United States Supreme Court has held:

> [T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. ... Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983.

*City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989).  The Sixth Circuit has discussed this possibility:

> A city may also be liable, in narrow circumstances, for failure to train its officials, if that failure gives rise to a clearly foreseeable violation of constitutional rights reflecting deliberate indifference to them:
>
>> "[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury."

*Sell v. City of Columbus*, 47 F. App'x 685, 691-92, (6th Cir. 2002) (quoting *City of Canton,* 489 U.S. at 390 ) (footnotes omitted).  The ultimate focus "[i]n resolving the issue of a [municpality's] liability, . . . must be on adequacy of the training program in relation to the tasks the particular officers must perform."  *City of Canton*, 489 U.S. at 390.

The instant case does not present a failure to train or supervise claim upon which a reasonable jury could find for Plaintiff.  The City of Columbus has produced evidence of training that need not be again summarized at length here because, as noted, Plaintiff has failed to respond to the merits of this claim.  *See* Doc. # 15, at 27 (summarizing training).  She has failed to point to any city custom, policy, or practice related to a constitutional deprivation.  *See Liptak v. City of Niles, Ohio,* 198 F.3d 246, 1999 WL 1045100, at *5 (6th Cir. 1999) (unpublished table

decision) (no § 1983 recovery where a plaintiff fails cite to any official city policy or custom).

Thus, even viewed in a light most favorable to Plaintiff, the only evidence before this Court thus

supports summary judgment in favor of the City of Columbus on the failure to train claim.

Because there is no unfavorable evidence whatsoever as to the type or extent of training

administered to city police officers, Plaintiff has failed to create a genuine issue of material fact

as to whether the city's training or supervision amounted to deliberate indifference to the rights

of those with whom officers come into contact. *Id.* at *7. Nor does Plaintiff offer an official

declaration of a flawed policy, custom, or practice. *See e.g.*, *Alkire v. Irving*, 330 F.3d 802, 815

(6th Cir. 2003) (holding that the testimony of a county jail official established a policy or custom

sufficient for § 1983 liability).

        This leaves the failure to investigate and discipline component of Plaintiff's *Monell*

claim.  Plaintiff's ratification claim similarly fails.  The city argues that it is entitled to summary

judgment because Plaintiff cannot present evidence that the investigation by the City of

Columbus into the incident was not meaningful or that the investigation, even if flawed,

represents any official policy or custom of deliberate indifference.

        The Court concludes that Plaintiff has failed to satisfy her burden of presenting evidence

upon which a jury could find a failure to investigate/discipline or ratification here.  As the city

states in its briefing, "Plaintiff offers no specifics, nor evidence, to support her conclusory

allegations, nor does plaintiff present evidence that any City custom or policy has caused the

alleged constitutional deprivation."  (Doc. # 15, at 25.)  This Court agrees.

        The Sixth Circuit Court of Appeals has explained that "[t]he theory underlying these

cases is that the municipality's failure to investigate or discipline amounts to a 'ratification' of

18

the officer's conduct." *Dyer v. Casey*, 72 F.3d 129, 1995 WL 712765, at *2 (6th Cir. 1995) (unpublished table decision).  That appellate court has also stated that "[i]n the failure to discipline context, it is appropriate to apply the deliberate indifference standard ... to require a showing of a history of widespread abuse that has been ignored by the City." *Berry v. City of Detroit*, 25 F.3d 1342, 1354 (6th Cir. 1994) (citing *City of Canton*, 489 U.S. at 397).  *See also Dyer*, 72 F.3d 129, 1995 WL 712765, at *2.

Plaintiff, however, has offered no evidence undercutting the city's investigation.  In contrast, Defendants have presented uncontested affidavit testimony and records supporting their assertion that a meaningful and appropriate investigation took place that, even if flawed, is not actionable.  Plaintiff has also failed to produce any evidence of other allegedly improper investigations pointing to a history of ignored widespread abuse.  Thus, even if an underlying constitutional violation has occurred, Plaintiff has not presented any evidence that would enable a reasonable jury to conclude that ratification of such misconduct exists.  Summary judgment is also appropriate on this aspect of Plaintiff's § 1983 *Monell* claim.

**C.  State Law Claims**

In addition to the federal claims addressed above, Plaintiff also asserts wrongful death and survivorship claims under state law.  The City of Columbus argues that it is statutorily immune under the doctrine of sovereign immunity set forth in Ohio Rev. Code § 2744.02(A)(1).  Plaintiff does not address this argument in her memorandum in opposition, presumably because she thought she was dismissing all claims against the city.  As explained above, however, Plaintiff's attempted dismissal was of no avail and left her claims subject to potential summary judgment.

19

Section 2744.02(A)(1) provides:

> Except as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function.

Ohio Rev. Code § 2744.02(A)(1). Determining whether a political subdivision is immune from tort liability under this statute involves a three-tiered analysis. This analysis requires asking, first, whether a "political subdivision" is involved and whether it was engaging in a "governmental or proprietary function" at the time of the incident allegedly giving rise to liability; if the answers to both questions are yes, then the general rule is that there is no liability. Second, a court must ask whether any of the various exceptions to immunity apply. Third, if immunity does not apply, a court must inquire whether a political subdivision qualifies for any of several potential statutory defenses. *Hubbard v. Canton City Sch. Bd. of Educ.*, 97 Ohio St. 3d 451, 453-55, 780 N.E.2d 543, 546-47 (2002); *Green Cty. Agric. Soc'y v. Liming*, 89 Ohio St. 3d 551, 557, 733 N.E.2d 1141, 1146 (2000); *Carter v. City of Cleveland*, 83 Ohio St. 3d 24, 28, 697 N.E.2d 610, 614-15 (1998).

It is beyond question that the City of Columbus is a "political subdivision" within the meaning of the statute and that its officers were engaging in either a "governmental or proprietary function." *Green Cty. Agric. Soc'y v. Liming*, 89 Ohio St. 3d at 556-57, 733 N.E.2d at 1146 (discussing interaction between Ohio Rev. Code § 2744.02(A)(1) and (B)). A "political subdivision" is a "a municipal corporation, township, county, school district, or other body corporation and politic responsible for governmental activities in a geographic area smaller than that of a state." Ohio Rev. Code § 2744.01(F). Additionally, under Ohio Rev. Code §

20

2744.01(C)(2)(a), a "governmental function" includes "[t]he provision or nonprovision of police, fire, emergency medical, ambulance, and rescue services or protection."  *See* Ohio Rev. Code § 2744.01(C)(1) (defining "governmental function" to include "a function of a political subdivision that is specified in [Ohio Rev. Code § (C)(2)]").

After concluding that the first requirement has been fulfilled and that the general rule of political subdivision immunity applies, the second tier of the requisite analysis presents the question of whether any of the exceptions to the immunity doctrine apply.  *Green Cty. Agric. Soc'y*, 89 Ohio St. 3d at 557, 733 N.E.2d at 1146.  These exceptions, set forth in Ohio Rev. Code § 2744.02(B), generally provide that a "political subdivision" may be liable in damages in a civil action for injuries (1) caused by the negligent operation of a motor vehicle, (2) caused by the negligent performance of proprietary functions, (3) caused by a failure to keep roads, highways, and streets open, in repair, and free from nuisance, (4) caused by negligence on the grounds of a building used for governmental purposes, or (5) for which liability is expressly imposed by statute.  Ohio Rev. Code § 2744.02(B)(1)-(5).  *See also Culberson v. Doan*, 125 F. Supp. 2d 252, 281 (S.D. Ohio 2000).  The Ohio Supreme Court has specifically spoken to these points, noting:

> R.C. 2744.02(B) provides five exceptions to the immunity created in R.C. 2744.02(A)(1) for political subdivisions. One of the exceptions, R.C. 2744.02(B)(2), establishes liability of political subdivisions for injuries caused by negligent acts performed by employees with respect to proprietary functions.  There is, however, no such general exception for governmental functions.  Consequently, except as specifically provided in R.C. 2744.02(B)(1), (3), (4), and (5), with respect to governmental functions, political subdivisions retain their cloak of immunity from lawsuits stemming from employees' negligent or reckless acts.

*Wilson v. Stark Cty. Dep't of Human Servs.*, 70 Ohio St. 3d 450, 452, 639 N.E.2d 105, 107 (1994) (citing *Garrett v. Sandusky*, 68 Ohio St. 3d 139, 624 N.E.2d 704 (1994)).  As the City of

21

Columbus correctly notes in its briefing, none of these exceptions apply to the facts of this case. Thus, under the second-tier of the analysis, the city remains entitled to immunity.

The Court therefore need not discuss the third and final tier of the analysis, which requires an assessment of whether a political subdivision qualifies for any of the defenses provided by statute, but only if statutory immunity does not apply. *Green Cty. Agric. Soc'y*, 89 Ohio St. 3d at 557, 733 N.E.2d at 1146; *see also* Ohio Rev. Code § 2744.03 (setting forth defenses and immunities used to establish nonliability).

Having concluded that the City of Columbus is entitled to summary judgment on Plaintiff's state law claims on the grounds of immunity, the Court now turns to Bowers' argument that he is entitled to immunity under Ohio Rev. Code § 2744.03(A)(6). That statute creates a presumption of immunity for political subdivision employees, subject to the following exceptions:

> (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
>
> (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;
>
> (c) Civil liability is expressly imposed upon the employee by a section of the Revised Code. Civil liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon an employee, because that section provides for a criminal penalty, because of a general authorization in that section that an employee may sue and be sued, or because the section uses the term "shall" in a provision pertaining to an employee.

Ohio Rev. Code § 2744.03(A)(6). Directing the Court to these exceptions, Plaintiff argues that § 2744.03(A)(6)(b) applies to defeat immunity here.

The same factual dispute that precludes summary judgment on the § 1983 claims against

22

Bowers also precludes summary judgment on the state law claims.  If the jury concludes that Bowers shot an unarmed Straughter and that the officer was more than merely negligent, then a jury could conclude that he acted unreasonably.  Such action could constitute an act done with a malicious purpose, in bad faith, or in a wanton or reckless manner to paraphrase the § 2744.03(A)(6)(b) immunity exception.  Necessarily constrained to view the facts in Plaintiffs' favor, this Court must conclude that the factual dispute and the § 2744.03(A)(6)(b) exception to immunity defeats Bowers' reliance on immunity to obtain summary judgment on Plaintiff's state law claims.

### IV.  Conclusion

The Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment.  (Doc. # 15.)  The City of Columbus is entitled to summary judgment on all claims asserted against it, while the claims against Bowers remain pending.

**IT IS SO ORDERED**.

_____/s/ Gregory L. Frost_____
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE